**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **FARHAD AZARI and** | : | **Case No: 23-cr-251 (RCL)** |
| **FARBOD AZARI,** | : | |
| | : | |
| **a/k/a "Francis Azari,"** | : | |
| | : | |
| **Defendants.** | | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Farhad Azari to 57 months' imprisonment, 36 months' supervised release, $2,000 in restitution, and the $200 mandatory assessment for violating 18 U.S.C. 111(b)(1) and 18 U.S.C. 231(a)(3). The government also requests that this Court sentence Farbod Azari, a/k/a "Francis Azari," to 57 months' imprisonment, 36 months supervised release, $2,000 in restitution, and the $200 mandatory assessment fee for violating 18 U.S.C. 111(b)(1) and 18 U.S.C. 231(a)(3). The Sentencing Guidelines range is 46 months to 57 months of imprisonment. The government's recommendation is at the high-end of the guidelines range for both Farhad and Farbod Azari, given the severity and violence of their conduct.

## I.     INTRODUCTION

The defendants, Farhad and Farbod Azari,[1] participated in the January 6, 2021, attack on

_____

[1] Given the defendants shared last name, the government will refer to them as "Farhad" and

the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[2]

The Azaris chose to be extremely violent on January 6, 2021, seemingly without regret. They joined rioters on the West Plaza of the Capitol building, where Farbod screamed and spat at police officers while Farhad yelled, assaulted, and threw objects at officers over the course of an hour. Farbod also ripped up permanent fencing on the steps and actively encouraged other rioters to move closer to the Capitol multiple times, including waiving rioters into the scaffolding that covered the Northwest Stairs and waiving rioters onto the Upper West Terrace. Farhad entered the Capitol building twice, first through a broken window in Senate Wing Door hallway and then again through the fire-door in the Parliamentarian's Hallway. A few weeks later, the Azaris discussed the need to delete evidence of their conduct on January 6th from their phones, including Farbod indicating that he deleted his social media and pictures from that day. When interviewed by the FBI, the Azaris referred to themselves as patriots and denied being at the Capitol on January 6,

"Farbod" when referring to them individually and as the "Azaris" when referring to them collectively.

[2] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

2021.

The government recommends that the Court sentence Farhad Azari to 57 months' imprisonment and Farbod Azari to 57 months' imprisonment for their convictions of violating 18 U.S.C. § 111(b)(1) and 18 U.S.C. § 231(a)(3). These sentences reflect the gravity of the Azaris' conduct.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 60, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

### B.  Injuries and Property Damage Caused by the January 6, 2021, Attack

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the

3

rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred members of law enforcement. See Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, available at https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott,

Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.9 million dollars.

      **C.**      **Farbod Azari's Role in the January 6, 2021, Attack on the Capitol**

Farbod Azari lives in Richmond, Virginia. On January 6, 2021, Farbod and his father, Farhad traveled to Washington, D.C. After the Azaris arrived in Washington, D.C. on January 6, 2021, they went to the Capitol where they joined in the protest of Congress' certification of the Electoral College outside the West Front of the Capitol. At some point, Farbod and Farhad separated and engaged in the riot separately. By approximately 1:12 p.m., police officers had cleared rioters from an area on the south side of the West Plaza of the capitol building and were erecting metal bike-rack style fencing at the top of a set of steps. At the foot of the steps was a row of black metal fencing, with a sign reading "KEEP OFF FENCE" affixed to it. At approximately 1:13 p.m., while other rioters dismantled sections of the fencing at the foot of the steps, Farbod approached a section of the fencing slightly farther south. Farbod gestured at the line of officers and yelled. Farbod then spat at the line of officers, as depicted below in Exhibit A, and retreated into the crowd:



Exhibit A, Image 1 (*Farbod, circled in red, spatting and yelling at a line of police officers*)



Exhibit A, Image 2 (*Farbod, circled in red, continuing to spit and yell towards police officers*)

Several seconds later, Farbod approached the fencing again and threw a water bottle at

the line of officers, as depicted below:

6



Exhibit A, Image 3 (*Farbod, circled in red, yelling at police officers*)



Exhibit A, Image 4 (*Farbod, circled in red, gesturing towards police officers*)



Exhibit A, Image 5 (*Farbod, circled in red, yelling and gesturing towards police officers, water bottle circled in green*)

At approximately 1:18 p.m., Farbod joined rioters dismantling a section of the black fencing at the base of the steps by kicking and pulling at it, using his foot to kick at and stomp on the gate, until it was flat on the ground. *See* Exhibit B, Images 6 and 7.



Exhibit B, Images 6 and 7 (*Farbod, circled in red, kicking down and stomping permanent black fencing*)

Shortly after 2:00 p.m., Farbod joined a crowd of rioters under scaffolding erected over the Northwest stairs—a set of steps leading from the north side of the West Plaza of the Capitol, to the north side of the Upper West Terrace of the Capitol. As other rioters tried to break through metal bike-rack barricades guarded by USCP officers, Farbod waved a red flag on white flagpole, as depicted below. *See* Exhibit C, Image 8.



Exhibit C, Image 8 (*Farbod, circled in red, holding a red flag and flagpole joining the crowd of rioters under scaffolding*)

Farbod then jabbed the flagpole at the line of USCP officers and made physical contact with an officer's arm. *See* Exhibit C, Image 9.



Exhibit C, Image 9 (*Farbod, circled in red, using the flagpole to jab at officers*)



Exhibit D, Image 10 (*Farbod using the flagpole, circled in red, to jab at officers*)

At approximately 2:09 p.m., the rioters breached the barricades and surged up the Northwest stairs towards the Capitol building. Farbod, at the front of the group, chased retreating USCP officers up the stairs. *See* Exhibit E, Image 11.



Exhibit E, Image 11 (*Farbod, circled in red, running up the northwest stairs, gesturing for the crowd to follow him up the stairs*)

Farbod gestured at the crowd, encouraging them to follow him up the steps. By approximately 3:30 p.m., Farbod rushed to the north side of the Upper West Terrace of the Capitol building, where police officers had formed a line between rioters and the Capitol building. At this point, Farbod had been on restricted grounds for over two hours. One rioter counted down from ten, gesturing at other rioters to follow him, then ran at the line of officers attempting to break through. *See* Exhibit F. Farbod emerged from the crowd, holding a water bottle and waving at other rioters to follow him. *See* Exhibit F, Image 12. Farbod attempted to break through the line of officers by pushing his shoulder into a police officer who was standing between him and the Capitol building. *See* Exhibit F, Image 13. The officer pushed Farbod back into the crowd:



Exhibit F, Image 12 (*Farbod, circled in red, gesturing towards other rioters to follow him towards the police line*)



Exhibit F, Image 13 (*Farbod, circled in red, pushing against the line of police officers*)



Exhibit G, Image 14 (*Farbod, circled in red, pushing against a line of police officers*)

Farbod then threw a water bottle at the line of officers:



Images 15 and 16 (*Farbod, circled in red, throwing a water bottle towards police officers*)

Moments later, Farbod picked up a flagpole with a blue and white "Trump" flag off of the ground, raised it behind his head, took several steps towards the line of police officers, and swung the flagpole towards the line of officers as depicted below in Exhibits H and F:



Exhibit H, Image 17 and Exhibit F, Image 18 (*Farbod, circled in red, with a flagpole over his head, raising it towards officers*)



Exhibit H, Image 19 (*Farbod, circled in red, swinging a flagpole at a line of police officers*)

Azari then retreated several feet and held the flagpole like a spear before he threw it at

the line of officers. *See* Exhibit H, Image 20.



Exhibit H, Image 20 (*Farbod, circled in red, throwing a flagpole towards police officers*)



Exhibit F, Image 21 (*Farbod, circled in red, throwing a flagpole towards police officers*)



Exhibit H, Image 22 (*Farbod, circled in red, throwing a flagpole towards police officers*)

### D.  Farhad Azari's Role in the January 6, 2021, Attack on the Capitol

After Farhad and Farbod separated, sometime after 1:00 p.m., Farhad made his way to the

south side of the West Plaza. Once there, he moved to the front of a group of rioters on the West

Plaza of the Capitol building. Farhad engaged with officers defending the police line multiple

times. First, Farhad threw a water bottle at the police line. *See* Images 23 and 24 below.



Exhibit A, Image 23 (*Farhad holding water bottle, circled in yellow*)



Exhibit A, Image 24 (*Farhad, circled in yellow, holding water bottle and preparing to throw the bottle*)

Next, around 1:13 p.m. to 1:14 p.m., Farhad rushed police officers from the Metropolitan

Police Department (MPD) as they arrived on scene to reestablish the police line broken earlier by

rioters. Farhad kicked a bike rack and then joined with other rioters in pushing the rack back against

police officers, in a clear attempt to break the newly established line. *See* Images 25-26 below.



Exhibit I, Image 25 (*Farhad, circled in yellow, kicking at a bike rack*)



Exhibit I, Image 26 (*Farhad, circled in yellow, pushing a bike rack into officers*)

19



Image 27 (*Farhad, circled in yellow attempting to, with other rioters, break the police line*)

Approximately 30 minutes later Farhad confronted a line of police officers on the north side of the West Plaza, near the foot of a set of stairs leading to the Upper West Terrace of the Capitol building. *See* Image 27.



Exhibit J, Image 28 *(Farhad standing in front of line of officers with knit cap off and backpack on)*

Farhad yelled at officers and attempted to kick an object on the ground in the direction of the officers. When that failed, Farhad picked up a flagpole and hurled it at the line of officers. *See* Images 28-30.



Exhibit J, Image 29 (*Farhad attempting to kick an object in the officers' direction*)



Exhibit J, Image 30 (*Farhad holding a flagpole*)



Exhibit J, Image 31 (*Farhad and the flagpole traveling in the direction of the officers*)

Shortly after Farhad threw the flagpole, he obtained an air horn and threw that, too, toward officers.

*See* Images 32 and 33.



Image 32 (*Farhad, circled in yellow, holding an air horn*)

23



Image 34 (A*ir horn, in the air, circled in green*)

Farhad entered the U.S. Capitol Building via the Senate Wing Doors at approximately 2:14 p.m. through a broken window while holding his cell phone videoing his entrance. Farhad was one of the first rioters into the Capitol Building and entered during the first breach of the Senate Wing Doors. *See* Image 35.



Image 35 (*Farhad, circled in yellow, entering the Capitol via a broken window*)

After breaching the Capitol, Farhad proceeded toward the Crypt.  While in the Crypt, Farhad attempted to direct rioters to rush the police line that had formed to prevent further incursion into the Capitol.  Farhad also continued to take photographs and videos while inside the Crypt before returning to the Senate Wing Door area.  Farhad exited the Capitol at approximately 2:35 p.m. via the same broken Senate Wing Door window through which he entered.

At approximately 2:46 p.m., Farhad reentered the Capitol building via the Parliamentarian doors and entered an office.  *See* Image 37.



Image 36 (*Farhad, circled in yellow, after entering via the Parliamentarian doors and then entering an office*)

Farhad then left the Capitol building via the Parliamentarian doors at approximately 2:50 p.m., exiting onto the plaza outside of the Senate Wing Door, also known as the Northwest Courtyard. On his way out, Farhad encouraged other rioters to enter the Parliamentarian door. *See* Image 37.



Image 37 *(Farhad waiving people into the Capitol)*
*Mitigation Action by Farhad*

After Farhad exited the Capitol for the second time, he stood on the Upper West Terrace in front of MPD officers that had formed a police line in an effort to block access to the Capitol building. Farhad stayed there for a while, encouraging other rioters not to attack police.

*The Azaris' Messages After January 6, 2021*

Weeks after he assaulted police officers at the Capitol building, Farbod texted Farhad "These motherfuckers want to start a war they're going to get it" and "Let's fight motherfuckers." *See* Images 38 and 39.

26



Images 38 and 39 (*Screen shot of messages between Farhad and Farbod (Francis) Azari*)

At least on two separate occasions, the Azaris also discussed the need to delete evidence of their conduct on January 6th from their phones, including Farbod indicating that he deleted his social media and pictures from that day. *See* Images 40 and 41.



Images 40 and 41 (*Screen shot of messages between Farhad and Farbod (Francis) Azari*)

*The Azaris' FBI Interview*

On April 13, 2021, the FBI interviewed Farbod and Farhad. For the first part of the interview, Farbod was not present. When FBI agents initially showed Farhad photos of himself at the Capitol, he responded that he was not at the Capitol on January 6th and denied traveling to Washington, D.C. He said the images and videos he was shown could be any "brown man." He claimed a lot of people look alike and that the photos and videos were not him.

During the interview, Farbod arrived, he also denied any involvement in the riots at he Capitol on January 6th. Farbod stated that he was not at the U.S. Capitol on January 6, 2021, and any person the agents believed could be him could also be any brown man. They both stated they were at Farbod's house all day on January 6, 2021. To further their ruse, they told the FBI to make

inquires with neighbors to check their story Farbod also stated that he loved America and pointed to the American flag on his porch.

Later, during a search of both Azaris' phones, location cell data placed both men within restricted Capitol Grounds on January 6, 2021.

### III.   THE CHARGES AND PLEA AGREEMENT

On November 3, 2023, a federal grand jury returned a superseding indictment charging Farbod Azari with 12 counts and Farhad Azari with 11 counts. On January 22, 2024, the Azaris pleaded guilty to pursuant to plea agreements to one count each of Civil Disorder, in violation of Title 18, United States Code, Section 231(a)(3), and Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of Title 18, United States Code, Sections 111(a)(1) and (b),

### IV.   STATUTORY PENALTIES

The Azaris now each face sentencing on one count of Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) and one count of Assaulting, Resisting, or Impeding Certain Officers with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. 111(b)(1).

As set forth in their respective plea agreements as well as in the Presentence Reports issued by the U.S. Probation Office, both defendants face up to 20 years of imprisonment; a fine of $250,000, pursuant to 18 U.S.C. § 3571(b)(3); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2); restitution; and a mandatory special assessment of $100 for each felony conviction.

### V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). For both defendants, the government agrees with the calculations set forth in their respective final PSRs. *See* Farhad PSR ¶ 106; Farbod PSR ¶ 113.

### Count One, Civil Disorder in violation of 18 U.S.C. § 231(a)(3)

Since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, use "the most analogous guideline." U.S.S.G. § 2X5.1. Here, that is U.S.S.G. § 2A2.4, "Obstructing or Impeding Officers."

| Guidelines Manual Provision | Description of Provision | Points |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Physical contact | +3 |
| U.S.S.G. § 2A2.4(b)(1)(B) | Dangerous weapon possessed and its use threatened | +3 |
| U.S.S.G. § 2A2.4(b)(2) | Victim sustained bodily injury | +2 |
| U.S.S.G. § 2A2.4(c) | Cross-reference: "If the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault)."<br><br>"Aggravated assault," under n.1 to § 2A2.2 "means a felonious assault that involved . . . (D) an intent to commit another felony." | |
| U.S.S.G. § 2A2.2 | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2 (a) & (b) | Victim was a Government Officer | +6 |
| U.S.S.G. § 3E1.1 | AOR | -3 |
| | **TOTAL** | **17** |

### Counts Four and Six, in violation of 18 U.S.C. §§ 111(a)(1) and (b), Assaulting, Resisting, or Impeding Certain Officers

| Guidelines Manual Provision | Description of Provision | Points |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Physical contact | +3 |
| U.S.S.G. § 2A2.4(c) | Cross-reference: "If the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault)." | |

| | | |
|---|---|---|
| | "Aggravated assault," under n.1 to § 2A2.2 "means a felonious assault that involved . . . (B) serious bodily injury . . . or (D) an intent to commit another felony." | |
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| | | |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon<br><br>A dangerous weapon under U.S.S.G. § 1B1.1 cmt. n.1(E) means (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument. | +4 |
| U.S.S.G. § 2A2.2(b)(7) | Conviction under § 111(b) | +2 |
| U.S.S.G. § 3A1.2 (a) & (b) | Victim was a Government Officer<br><br>U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)." | +6 |
| U.S.S.G. § 3E1.1 | AOR | -3 |
| | **TOTAL** | **23** |

*See* Farbod Plea Agreement at ¶¶ 5(A) and Farhad Plea Agreement at 5(A).[3]

### U.S.S.G. § 4C1.1(a)(3) Offense Level Decrease

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. However, a defendant may only receive a decrease in offense level pursuant to that guideline if "the defendant did not

---

[3] The plea agreement for both defendants included an additional offense level point based on grouping that the Government is not now contesting.

use violence or credible threats of violence in connection with the offense." *See* U.S.S.G. § 4C1.1(a)(3). Farbod may not, however, receive a two-level reduction pursuant to § 4C1.1 because his offenses involved violence. *See* U.S.S.G. § 4C1.1(a)(3).

There is no question that the Azaris' offenses involved violence on multiple occasions. "In evaluating whether credible threats of violence were posed by the defendant's offense conduct, to my mind, the context matters very critically. In other words, evaluating a defendant's offense conduct requires examination of all the factors of the offense including what the particular defendant being sentenced did; where he was; what he was seeing; what a person would reasonably understand was the volatility of the situation; the threat that whole situation would pose to others; the foreseeable harm of the situation; and the consequences of the specific defendant's individualized actions." *United States v. Andrulonis*, No. 23-cr-085 (BAH), Sentc'g Hrg. Tr. at 11-12.

The government is aware of multiple cases in which courts have rejected the application of § 4C1.1 to January 6 defendants that engaged in similar conduct as the Azaris. The Azaris threw water bottles, flag poles, and other objects at police officers, yelled and spit at police officers, pushed into police officers, and used a flagpole as a spear. The Azaris not only used physical force, but accompanied that physical force with fury, vehemence, and outrage as seen by yelling at police officers and encouraging the crowd of rioters to join them in engaging with police officers. *See e.g.*, *United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 4-5*; see also United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at 5 (adopting TNM's definition of violence from Bauer). Additionally, the court in *United States v. Williams* determined that the defendant used violence or the credible threat of violence when the defendant stood in front of the police line in the Rotunda, turned her back to the police line, and yelled at other protestors to push her into

the police line to stop them from advancing, while verbally harassing the police. No. 21-cr-618 (ABJ), March 22, 2024. Both Farhad and Farbod's use of violence or credible threats of violence in connection with their offenses disqualify them from a reduction pursuant to U.S.S.G. § 4C1.1(a)(3).

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[4]

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As described in Section II (B) & (C) of this memorandum, the Azaris' felonious conduct on January 6, 2021. was part of a massive riot that almost succeeded in preventing the certification

---

[4] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The Azaris were consistently violent on January 6, 2021. Farbod violently engaged with multiple police lines including throwing multiple water bottles and using flagpoles to harm or otherwise impede police officers. Farbod also encouraged other rioters to join him in obstructing police officers. For his part, Farhad joined with other rioters in pushing a bike rack into a line of officers as they attempted to reestablish a police line on the West Plaza, threw and kicked objects toward officers, entered the Capitol through a broken window, and waived other rioters into the breached building. The nature and circumstances of their offenses were of the utmost seriousness, and fully support the government's recommended sentence of 57 months.

### B.  The History and Characteristics of the Defendant

Farbod has zero criminal history points, has maintained employment, and complied with his conditions of release. These aspects of his history and characteristics are mitigating but not to a degree that they warrant a downward variance. Despite spending hours on Capitol grounds on January 6, 2021, Farbod waited until a few weeks before trial to plead guilty. Additionally, unlike many defendants who told law enforcement about their presence on Capitol grounds on January 6, Farbod denied that he was in Washington, D.C. On balance, this factor supports the government's recommendation.

Similarly, Farhad has zero criminal history points, has maintained employment, and complied with his conditions of release. However, Farhad initially lied to the FBI about his trip to D.C., saying that the photos they showed him (including photos included in the SOO) were not of him.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. The Azaris' criminal conduct on January 6 was the epitome of disrespect for the law. The Azaris' conduct cannot be minimized to protesting or actions as a result of their disagreement of the 2020 election results. "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233-ABJ, Tr. June 9, 2023 at 20. Both Azaris repeatedly assaulted and obstructed officers as they protected the Nation's Capital from the massed rioters. Indeed, Farbod further demonstrated his contemptuous disrespect for those officers by spitting on them. For his part, Farhad saw MPD officers working to reestablish order and re-form the broken police line when he forcibly undermined their efforts by kicking and pushing apart the bike rack barricades.

**D.      The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

---

[5] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Farbod did not express any remorse for his actions prior to his arrest, and his continuously violent actions towards law enforcement are reason to provide specific deterrence from committing future crimes. Farhad, too, expressed no regret for his violent and assaultive behavior on January 6; in fact, both described themselves as "patriots."

With respect to the need to protect the public from his actions, the Court should consider the Azaris' actions on that day, but also the broader danger to our democracy that the Azaris' actions implicate. Their actions struck at the root of our democracy. When faced with an election outcome they did not like, they indulged in a fantasy, without any evidence, for why the election didn't count. They then acted on this fantasy, joining a flood of rioters who took the Senate and accomplished a goal many could never have imagined—halting the peaceful transfer of power upon which our democracy is built. Equally concerning is their willingness to be violent towards law enforcement officers. The Azaris' actions cannot be minimized to political disagreement. "Violence risks begetting a vicious cycle that could threaten cherished conventions and imperil our very institutions of government. In that sense, political violence rots republics. Therefore, January 6 must not become a precedent for further violence against political opponents or governmental institutions. This is not normal. This cannot become normal. We as a community, we as a society, we as a country cannot condone the normalization of the January 6 Capitol riot." *United States v. Johnatakis*, 21-CR-91-RCL, ECF 272 at 5 (April 3, 2024).

It is unlikely that Farbod's worldview has changed so much that he will be deterred from similar conduct in the future absent a significant sentence. Farbod quite literally spit in the faces

of the officers trying to protect the Capitol building and those inside. Farbod's actions provide compelling reasons to support a term of incarceration on the high-end of the guidelines to deter him from taking action again. While Farhad did shift from assaulting officers to trying to calm down the crowd, the damage had been done. Further, Farhad's somewhat mitigating actions on the 6th were not indicative of a larger sea change in his worldview—indeed, he continued to lie about his involvement on January 6, his trip to Washington D.C., and only pled guilty faced with the prospect of being found guilty at trial.

###    E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

###    F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s]

and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6]

---

[6] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[7] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case. The Azaris' level of violence, time spent on Capitol grounds, and number of assaults on officers all support a sentence on the high end of the recommended sentencing guidelines.

For example, Mark Ponder was sentenced to 63 months incarceration for swinging a flagpole at and striking police with a flagpole in violation of 111(a) and (b). *United States v. Ponder*, 21-cr-259 (TSC). Unlike Ponder, the Azaris have also pleaded guilty to additional charges. During his three hours in the restricted area, Ponder committed multiple assaults. Ponder swung a pole at an officer. After that pole broke against the officer's riot shield, Ponder re-armed himself with another pole and assaulted another officer. He then assaulted a third officer with the pole. Farbod also swung and struck police officers separate times with flagpoles.

Another similar case is Robert Palmer. *United States v. Palmer*, 1:21-CR-00328 (TSC). The defendant, like the Azaris, assaulted multiple police officers. While in the area, Palmer threw wooden items at officers and sprayed a fire extinguisher at them. For assaulting law enforcement officers with a dangerous or deadly weapon, Palmer was sentenced to 63 months' imprisonment for violating Sections 111(a) and (b).

---

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

This Court sentenced Scott Fairlamb, a New Jersey gym owner and MMA fighter, to 41 months imprisonment based on a single 18 U.S.C. § 111(a)(1) assault, in addition to a violation of 18 U.S.C. § 1512. *United States v. Fairlamb*, 1:21-CR-00120 (RCL). Fairlamb was part of a group of rioters who broke through a police line in the Upper West Terrace area and forced their way into the Capitol. After leaving the Capitol, Mr. Fairlamb offered an officer water and told others in the crowd to leave the officers alone. However, approximately 20 minutes later, Mr. Fairlamb began harassing a line of MPD officers who were attempting to make their way through the thick crowd of rioters to join a larger group of officers, shoving and punching one in the face. Likewise, Farbod attempted to strike police officers with flagpoles on two separate occasions, threw two water bottles at the police line, charged at the police line pushing into officers, spit at police officers, and waved the crowd of rioters towards the police. Although Farbod never entered into the Capitol building, he engaged in violent behavior on the Capitol grounds for hours and, unlike, Fairlamb, made no effort to assist any of the officers.

Fairlamb is also a useful comparison case for Farhad. Like Fairlamb, Farhad entered into the Capitol building – indeed, he did so twice. Like Fairlamb, Farhad did take some steps to try to calm the crowd down—after he violently attacked officers on the West Plaza, entered the Capitol through a broken window, and waived rioters into the Capitol through the Parliamentarian door. Neither Azari has never expressed remorse for their actions. In fact, Farbod called himself a patriot and told the FBI that he wasn't at the Capitol on January 6, 2021. Similarly, Fairlamb made statements suggesting he was proud of what he did and destroyed evidence. The Azaris' conduct warrants a higher sentence than Fairlamb given their multiple violent interactions with police officers and because Fairlamb was convicted of 18 U.S.C. § 111(a), not § 111(b).

Duke Wilson received a sentence of 51 months after his guilty plea to violation of 18 U.S.C. § 111(a)(1). *United States v. Wilson*, 1:21-CR-00345 (RCL). Like Farbod, Wilson did not enter the Capitol, but Wilson engaged in several acts of violence against three police officers, including punching them, attempting to take their shields, and throwing objects at them. However, unlike Farbod, Wilson took responsibility for his actions and expressed remorse for his conduct. Weeks after he assaulted police officers at the Capitol building, Farbod texted his father "These motherfuckers want to start a war they're going to get it" and "Let's fight motherfuckers".

Farbod's conduct is also more aggravated than James Elliott's, whom the Court sentenced to 37 months – a Guidelines sentence – after Elliott pled guilty to a single violation of Section 111(a). *United States v. Elliott*, 21-cr-735 (RCL). Elliot hoisted his flagpole in the air multiple times and encouraged other rioters to confront police officers. He also swung his flagpole at a police officer hitting him on the head. Several obvious contrasts with Farbod's exist: Farbod is convicted of a 111(b) and a 231(a)(3) –more aggravated offenses; Elliott was the father of very young children and a critical source of economic support for his family; Elliott expressed remorse; and Elliott committed a single assault. Farbod's multiple assaults and lack of remorse warrant a higher sentence.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[8] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that the Azaris must pay $2,000 in restitution, which reflects in part the role the Azaris played in the riot on January 6.[9] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 14, 2022. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) The Azaris restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 12.

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[9] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   FINE

The defendants' convictions for violations of 18 U.S.C. §§ 111(b) and 231 subject them each to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *see* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), I (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 52[8] (11th Cir. 1994).

Here, the defendants have not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $20,000-200,000. U.S.S.G. § 5E1.2(c).

*      *      *

43

**IX.     CONCLUSION**

For the reasons set forth above, the government recommends that the Court impose a sentence of 57 months' imprisonment, 36 months supervised release, $2,000 in restitution, and the $200 mandatory assessment fee for their convictions of violating 18 U.S.C. 111(b)(1) and 18 U.S.C. 231(a)(3).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:     */s/ Kyle M. McWaters*
       Kyle M. McWaters
       Assistant United States Attorney
       D.C. Bar No. 241625
       601 D Street NW
       Washington, DC 20003
       (202) 252-6983
       kyle.mcwaters@usdoj.gov


By:     */s/ Taylor L. Fontan*
       Taylor L. Fontan
       Assistant United States Attorney
       IN Bar No. 35690-53
       601 D Street NW
       Washington, DC 20003
       (202) 815-8597
       taylor.fontan@usdoj.gov