UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


| | | |
|---|---|---|
| UNITED STATES | : | |
| v. | : | Crim. No. 23-CR-251 (RCL) |
| FARHAD AZARI | : | |

## <u>MEMORANDUM IN AID OF SENTENCING</u>

COMES NOW Defendant, Farhad Azari, through undersigned counsel, Stephen F. Brennwald, Brennwald & Robertson, and submits the following Memorandum in Aid of Sentencing.  Defendant argues herein that under the unique circumstances of his case, a sentence of 18 months, followed by a one-year period of home confinement, followed thereafter by a period of supervised release and an order of restitution, would constitute a sentence that is sufficient, but not greater than necessary, to accomplish the goals enumerated in 18 U.S.C. § 3553(a).

### *Background*

Mr. Azari is before this Court after having pled guilty to one count of Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. §§ 111(a)(1) and (b), and one count of Civil Disorder, in violation of 18 U.S.C. § 231(a)(3).

The Statement of Offense and the government's sentencing memorandum lay out the basic facts that form the basis of Mr. Azari's guilty plea.

In essence, Mr. Azari walked to the Capitol, pushed a bike rack while police officers were on the other side of it, attempted to kick an object that was on the ground (but missed), threw a bottle of water, an airhorn, and a flagpole in the air in the general direction of the police, entered the Capitol on two occasions, and then left.  His first entry into the Capitol lasted 24 minutes, and the second lasted four minutes.[1]

All of these actions are reprehensible and illegal, and there is no legal excuse for them.

The government claims in its memorandum that Mr. Farhad Azari was one of the first persons to enter the Capitol, but that is demonstrably false.[2]  Nevertheless, whether he was the 30th or the 100th person to enter the Capitol, he never should have entered the building under any circumstances.

 Paradoxically, while Mr. Azari engaged in criminal conduct outside the Capitol, and illegally entered the Capitol, when he was in the Capitol he, at some point, raised his arms out to protect the police officers who were trying to keep the crowd from entering further into the Capitol.

He did this at great physical (and reputational) risk to himself, yet he stood in front of a line of officers, signaling to the crowd not to advance any farther into the Capitol.

---

[1] As the government's own sentencing memorandum details, Mr. Farhad Azari entered the Capitol the first time at 2:14 p.m., and left at 2:35.  He then re-entered the Capitol at 2:46 p.m. and exited at 2:50 p.m.  *Gov. Sent. Memo.* at 24=25.
[2] *Id*. at 24.  The government's own exhibit, Figure 35, shows Mr. Azari entering a room in the Capitol where many other people were already present.



The picture above, taken from an open source video, shows Mr. Azari's arms outstretched in front of an officer, and it is clear from this still shot that the area behind the officer was still free of individuals.[3]

The picture below is taken from farther back, and clearly shows the line of officers in front of which Mr. Azari was standing, as well as the front of the crowd that was attempting to push past Mr. Azari and the officers.  In the actual video clip, which includes sound, a number of people can be heard yelling or otherwise making noise, something that must have been intimidating both to the officers as well as to Mr. Azari. Despite this, Mr. Azari stood there, alone among non-police officers, and raised his arms in an attempt to protect the officers and stop others from breaching the line.

---

[3] Mr. Azari is wearing a black jacket and a black knit cap, and is immediately in front of a police officer whose gold badge is visible over Mr. Azari's left shoulder.



In this picture, Mr. Azari appears to the right, wearing a black jacket and a black knit cap.  He is immediately to the right of the man in the black tank top.

The foregoing essentially summarizes Mr. Farhad Azari's actions that day.

### *Analysis of Sentencing Factors*

As this Court knows, pursuant to *United States v. Booker*, 543 U.S. 220 (2005) and *Gall v. United States*, 128 S.Ct. 586, 596-97 (2007), not only are the United States Sentencing Guidelines no longer mandatory, they are not even presumptively reasonable. In determining an appropriate sentence, this Court must consider the factors delineated in 18 U.S.C. § 3553(a), and impose a sentence that:

    1)  reflects the seriousness of the crime;

    2)  promotes respect for the law;

    3)  provides just punishment;

4) deters criminal conduct;

5) protects the public from further crimes, and

6) provides the Defendant with any necessary educational or vocational training, medical care, or other correctional treatment.

In addition, this Court must also consider

1) the nature and circumstances of the offense;

2) the history and characteristics of the defendant;

3) the kinds of sentences available;

4) the sentencing range;

5) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and

6) the need to provide restitution to any victims of the offense.

***Sentencing Guideline Enhancement***

Before addressing the 3553(a) factors, defendant notes that his plea agreement includes a four-level enhancement for the use of a dangerous weapon, pursuant to U.S.S.G. 2A2.2(b)(2)(B).

Defendant does not contest the fact that the plea agreement includes this enhancement. He does note, however, that the four-level increase called for by this enhancement, while technically applicable, overstates the severity of his conduct that day such that a downward variance would be appropriate.

As the Court knows, a dangerous weapon is defined  as "an instrument capable of inflicting death or serious bodily injury … or an object that is not an instrument capable of inflicting death or serious bodily injury but … closely resembles such an instrument []or … the defendant used the object in a manner that created the impression that the object was such an instrument."  U.S.S.G. 1B1.1 cmt n.1(E).

Here, the four possible "instruments" used by the defendant were a bike rack, a water bottle, an airhorn, and a flagpole that was thrown up in the air and took an arcing trajectory (as opposed to having been used as a jabbing weapon).

Theoretically, many non-dangerous objects may be capable of inflicting death or a serious bodily injury.  Thus, a fork, a screwdriver, a drinking glass, or other generally non-dangerous objects may be used in a way that kills or seriously injures another person.

This guideline, however, clearly refers to an object that is inherently more dangerous than the objects just listed (i.e., the fork, etc….).

While a flagpole could somehow cause a serious injury if used in a certain manner, the guideline contemplates a greater punishment in the case where an inherently more dangerous object is used.

So while the defendant does not dispute that the guideline applies, it does so as to these objects (a flagpole, a water bottle, a bike rack and an airhorn) only in the most technical sense, and only in circumstances that would be unlikely to occur in real life.

Because of that, Mr. Azari submits that the Court should vary downward to account for this reality.

### *Analysis of 3553(a) Factors*

### *The Proposed Sentence Would Reflect the Seriousness of the Crime*

Mr. Azari's conduct, when viewed in context, was different, and less severe, than the actively assaultive behavior of many of the January 6 defendants who have been charged with assaulting officers that day.

For instance, many defendants physically punched officers. Some sprayed officers in the face with an extreme irritant. Others beat officers with objects. Yet others choked, kicked, restrained, and otherwise assaulted officers. Their actions were direct, and violent.

While Mr. Azari's actions in throwing a water bottle, an airhorn, and a flagpole (in an arcing fashion) could have injured an officer, they did not rise to the level of many other defendants convicted (whether by plea or trial) of a 111(a) or (b) offense.

Moreover, as shown above, Mr. Azari actually acted to protect officers on that day. That is an act of courage that almost no one else that day engaged in. And it came at great personal risk, both physically and reputationally. Yet he outstretched his arms in an attempt to prevent others from entering further into the Capitol, and stood in front of a line of police officers, facing down the mob. His sentence should reflect those acts of courage.

### *The Proposed Sentence Must Also Promote Respect for the Law, Provide Just Punishment to Mr. Azari, and Deter Criminal Conduct, both by him and by Others.*

Defendant submits that his arrest, and convictions of two felonies, already constitute a significant punishment to someone like Mr. Azari. Until January 6, 2021, he had lived a law-abiding life. He put in many years of hard work during his lifetime

including working on a merchant ship and in engine repair shops.  It was back-breaking work, but he did not shy away from any employment that would legally support his family.

Never in his life did he believe he would ever be charged, much less convicted, of any crime, and certainly not any felony.

But unique life circumstances ultimately led him to believe that the stated outcome of the 2020 election was a direct assault on democracy.

As this Court knows, Mr. Azari grew up in Iran, and was 20 years old at the time the Shah of Iran was toppled on February 11, 1979.  He witnessed what was essentially a coup, and it left an indelible mark in his mind that was impossible to forget.

Thus, when his own version of a monarch – Donald J. Trump – was said to have lost the election, he thought that his adopted country, the United States, was experiencing another coup by the Democrats.  This is "backwards," of course, but in his mind at the time he believed that another leader was being unjustly "deposed."

It is important for this Court to understand, however, that as of this writing, Mr. Azari no longer subscribes to this view, and instead feels duped by the former president. In fact, he is angry that the former president spread lies and set the events of January 6, 2021, in motion.

While Mr. Azari realizes that he made the choice to go to the Capitol and engage in the conduct he did, he never would have been there had it not been for the urging of the former president and the influence of the crowd that had been fomented into a frenzy.

After all of the dust settles, Mr. Azari will be, as he is now, a twice-convicted felon who will spend time in prison for engaging in conduct that goes against everything he believes in.

He has learned a very hard lesson as a result of his arrest and incarceration in this case, and the chances of his re-offending are nil.

Mr. Azari realizes, of course, that this sentencing factor also requires that the Court consider the need to deter "others" from the type of conduct Mr. Azari engaged in. And that, often (at least in counsel's view) results in sentences that are harsher than if the defendant was merely being sentenced for his own actions, without the need to scare (i.e., deter through fear) other would-be criminals.

While this factor is in the statute, counsel has always considered it an unfortunate inclusion. While the concept of needing to deter others is understandable, it often results in a sentence that, rather than punish a defendant for his or her actions, seeks to "make an example" out of him by factoring in the *possible future* actions of other, completely unrelated (legally), people.

Briefly, counsel has seen time and time again over the course of 37 years, in situations where at the time of sentencing a courtroom is full of other accused persons and/or their families, a judge decides that she cannot send a message to the broader community that a person can "get away" with certain behavior by receiving a light sentence, and therefore imposes a harsh(er) sentence than she might otherwise have.

If that same defendant had been sentenced in an empty courtroom, or in a situation where there would be no press coverage, he or she would have received a sentence that

the court believed was appropriate, rather than one that took into account the  need to "deter others."

Counsel has on quite a few occasions in the Superior Court, where many defendants await their hearings at the same time (unlike in federal court) asked the courtroom clerk to call his client's case last so that the above scenario was not created. While it has resulted in counsel having to wait many hours over the course of the years counsel has been practicing, that has been a small price for counsel to pay to save defendants months or years in prison and ensure a fair sentence is imposed.

In any event, in the case of Mr. Azari, defendant submits that anyone who knew all the facts of his case, including his spotless background, his lifelong employment, and the embarrassing consequences of his actions would view the proposed sentence of 24 months in prison as a fair one.  Such a person certainly would not want to go through everything Mr. Azari has gone through if that person decided to do what Mr. Azari has admitted doing here – pushing against a bike rack, throwing a flagpole, an airhorn, and a water bottle, and entering the Capitol twice for relatively short periods of time. For these reasons, defendant submits that the proposed sentence would accomplish the foregoing goals.

### *The Need to Protect the Public from Further Crimes*.

As noted above, there is absolutely no need to protect the public from any further crimes by Mr. Azari.  He has learned a very hard lesson, and at the age of 65, he is never going to re-offend.

***The Court's Duty to Provide the Defendant with any Necessary Educational or Vocational Training, Medical Care, or Other Correctional Treatment***.

Mr. Azari is not in need of any such services.

***The Need to Avoid Unwarranted Disparities***

In his efforts to find truly comparable cases, defense counsel has literally reviewed every single conviction, whether by trial or by plea, of defendants found guilty of a so-called "111" charge (aggravated assault).  Counsel must say that it has not been an easy task to find an "assault" that mirrors or parallels the actions of Mr. Azari on January 6, 2021.  The vast majority of assaults that resulted in convictions were "true" assaults where defendants punched, kicked, hit, choked, sprayed, or otherwise actually tried to physically harm a police officer.

The following examples, involving conduct that is still much more severe than what this Court must punish in Mr. Azari's case, at least give the Court some idea of the kinds of sentences that are being imposed in true assault cases.

United States v. Mark Leffingwell

Mark Leffingwell (21-CR-5-ABJ) also pled guilty to assaulting a police officer (a "111" charge) in connection with January 6.  But in Mr. Leffingwell's case, he *actually* assaulted a police officer – in fact, two police officers.  As the government noted in its sentencing memorandum, not only did Leffingwell actually strike two police officers *in the head*, no less, he also encouraged officers to join him and other rioters in their attempts to take the Capitol.

What makes Leffingwell's case even more galling is the fact that he was a military veteran, a disabled military veteran at that.  Yet he chose to try to overthrow the government on January 6, 2021, the very government he had sworn to protect from all enemies, foreign and domestic.

Mr. Azari did commit the acts he did – throwing a water bottle, an airhorn, and a flagpole, and helping to knock over a bike rack.  But unlike Mr. Leffingwell, who was sentenced to **six months** in prison, he did not strike two police officers or try to convince the police to turn against their own government.  And Mr. Azari actually protected the police line while inside the Capitol – an action that deserves great consideration as it risked personal physical harm to himself and scorn and condemnation from others.

United States v. Barton Shively, 21-CR-151(JMC)

Barton Shively pled guilty to two counts of assault under 18 U.S.C. §111(a)(1).

On January 6, 2021, Mr. Shively walked over barricades that had been knocked down by others, and grabbed a police officer by the officer's jacket, yelling at that officer.  He then struck a second officer in the officer's hand, head, and shoulder area. He then attacked *still more* officers, hitting one in the head with the officer's own baton, and kicking another officer with his (Shively's) boot.

After the attack, Shively gave a public news interview praising what the rioters had done that day.

For his actions, Mr. Shively was sentenced to *18 months* in prison on each count, to run concurrently, followed by three years of supervised release.

United States v. Matthew Ryan Miller, 21-CR-75(RDM)

Matthew Ryan Miller entered guilty pleas to one count of Obstruction of an Official Proceeding (a so-called "1512" charge) and one count of Assault (a "111") charge.

In his Statement of Offense ("SOF"), Mr. Miller admitted that he had posted a picture of himself on Instagram at the rally.

Mr. Miller then used a section of the temporary barriers used by the U.S. Capitol Police as a ladder to scale the walls of the west side of the Capitol plaza. He also assisted others who were scaling the wall and other architectural objects. *SOF*, at 4.

When he was at the lower west terrace, he "waved his hand, and said multiple times, 'come on' as the mob chanted 'heave ho' and rocked back and forth in a push towards the tunnel entrance…." Multiple times, Mr. Miller "put up his fingers and yelled 'one, two, three, push!'" *Id*.

The Statement of Offense also states that Mr. Miller, "[f]rom this position … threw a few unidentifiable objects towards the … tunnel where law enforcement officers were attempting to secure the U.S. Capitol." *Id*.

Finally, when Mr. Miller was closest to the tunnel, he used a fire extinguisher to spray into the tunnel where many law enforcement officers were pushing back against rioters. He therefore affected much more than one officer with the chemical contained in the fire extinguisher, and his actions actually caused direct contact with these officers – contact that was painful and lasting.

For his actions, including incitement to violence, he received a sentence of **33 months** in prison on each count, to run concurrently, and 24 months of supervised release.

Mr. Azari's actions come nowhere close to what Mr. Miller did that day, and because of that, his sentence should not come close to Miller's sentence.

United States v. Logan Barnhart, 21-CR-35(RC)

On January 6, 2021, Logan Barnhart and others attacked a line of police officers and knocked them to the ground.  During this attack, Barnhart grabbed an officer's neck and torso (apparently by grabbing his clothing) and dragged him over the body of another police officer and down a set of stairs where the officer was further attacked with weapons, including a flagpole and a baton.  The officer sustained physical injuries.

Shortly thereafter, Barnhart returned to the police line and joined others in charging against that line.  He then wielded a flagpole and used it to strike several more officers.

For all of that, Mr. Barnhart received a prison sentence of **36 months** followed by 36 months of supervised release (and other minor sanctions).

Summary of Comparable Cases

Mr. Azari could go on and on discussing other "111" cases that demonstrate the range of sentences judges have typically imposed in these circumstances.  It is notable, however, that these cases all involved actual physical assault on the body of a police officer, rather than the merely the throwing of objects, as unacceptable as that was.

The bottom line is that very few individuals have been indicted on 111 charges for merely throwing some objects at the police.  Rather, the vast majority of folks charged under that statute actually attempted to harm officers by punching, kicking, pulling, grabbing, spraying, or otherwise physically contacting officers in a brutal manner.

Mr. Azari admits that his conduct in taking throwing the aforementioned items was criminal, but it does not come close, even under these circumstances, to the conduct of any of the foregoing defendants, and as such, his sentence should be much lower than the sentences those men received.

### Conclusion

The government, in its memorandum, notes that Mr. Azari has not expressed any remorse for his actions.  That is not true, although he has not yet had the opportunity to speak at sentencing.

He has expressed to undersigned counsel, and he will express to this Court at sentencing, how he greatly regrets having been a part of the events of January 6.  He understands that it has brought shame on the United States, and on himself.  Were he able to turn back time and behave differently, he would.  But there is no question that he is very remorseful for his actions.  He just hasn't stood before this Court for sentencing yet, so his words have not yet been expressed in public.

One final consideration counsel wishes to mention is that because Mr. Azari "senior" (as opposed to his son) is 65 years old, any sentence he receives will be proportionately larger than it would be for a younger person.  Thus, a person who is 65

and is sentenced to 3 or 4 years in prison will "lose" a much greater percentage of his life expectancy than would someone who is only 20 or 30.

And, at the age of 65, Mr. Azari's life expectancy is 17 years.  A 30-year old male's life expectancy, by contrast, is more than 45 years.  Thus, a sentence of 4 years, for example, would "take" nearly a quarter of Mr. Azari's life from him, rather than less than 10% in the case of a 30-year old.

In the end, Mr. Azari behaved very badly, and childishly, on January 6.  His actions were criminal, and unacceptable.  He will pay the price for his behavior, but that price should be fair, and just.

After a careful consideration of all of the arguments presented herein, defendant submits that a sentence of 18 months in prison, followed by a one-year period of home confinement, followed then by a period of supervised release, would be just and fair, and sufficient, but not greater than necessary, to adequately punish him for his conduct, and accomplish all of the goals set out in the sentencing statute.

Respectfully submitted,

/s/

Stephen F. Brennwald, Esq.
Bar No. 398319
Brennwald & Robertson, LLP
922 Pennsylvania Avenue, S.E.
Washington, D.C.  20003
(301) 928-7727
(202) 544-7626 (facsimile)
E-mail:  sfbrennwald@cs.com

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing was sent by ECF, this 5th day of June, 2024, to all counsel of record.

/s/

Stephen F. Brennwald